IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWRENCE P. O'DONNELL, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 12-6529 |
| | : | |
| v. | : | |
| | : | |
| COLONIAL INTERMEDIATE UNIT 20, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**Jones, II, J.**                                                            **March 27, 2013**

Lawrence P. O'Donnell, a former Mental Health Worker and substitute Alternative

Education Teacher, brings this action against his former employer, Colonial Intermediate Unit 20

("CIU").  His Amended Complaint asserts claims under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951,

the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and for a procedural due

process violation under 42 U.S.C. § 1983.  Presently before this Court is Defendant's Motion to

dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons that follow, the Motion is

granted; Plaintiff's claims under the ADA and PHRA are dismissed without prejudice, and his

remaining claims are dismissed with prejudice.

**I.      LEGAL STANDARD**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v.*

*Roche Holdings Ltd.*, 292 F.3d 361, 374 n. 7 (3d Cir. 2002).  After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" do not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable of the alleged misconduct."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("All civil complaints must contain more than an unadorned the-defendant-unlawfully-harmed-me accusation.") (quoting *Iqbal*, 556 U.S. at 677).  Moreover, "the factual detail in a complaint [must not be] so undeveloped that it does not provide a defendant [with] the type of notice of claim which is contemplated by Rule 8 [of the Federal Rules of Civil Procedure]."  *Villegas v. Weinstein & Riley*, *P.S.*, 723 F. Supp. 2d 755, 756 (M.D. Pa. 2010) (quoting *Phillips*, 515 F.3d at 232).

## II.   **FACTS**

O'Donnell has been diagnosed with Major Depressive Disorder, Recurrent (DSM 296.32) and Anxiety Disorder, not otherwise specified - with features of Panic Disorder and Post-Traumatic Stress Disorder (DSM 300.00).  (Am. Compl. ¶ 18.)  Additional diagnoses include: Generalized Anxiety Disorder (300.02) with Dysthymia (300.4), Major Recurrent Depressive Disorder (296.33), Post-Traumatic Stress Disorder - with Childhood Physical and Emotional Abuse (309.81), Avoidant Personality Disorder - with co-dependent issues and compulsive, narcissistic aspects (301.82), and Refractory Hypertension and Morbid Obesity.  (*Id.*)  On or about 1988, he began receiving various forms of treatment for Anxiety and Depression.  (*Id.* ¶ 19.)  During the 2008-2009 and the 2009-2010 school years, O'Donnell informed his supervisor,

Sandra Binczak, Supervisor of Special Education, of his various medical disabilities and the treatments that he was receiving.  (*Id.* ¶ 20.)

O'Donnell alleges that he was hired by CIU in 2006 as a mental health worker, assisting primary teachers in the classroom.  (*Id.* ¶ 3.)  In August of that year, he was promoted to a teacher position and began work at the Northampton County Juvenile Justice Center, where the CIU ran an  alternative education program for students assigned to the detention center by court order.  (*Id.* ¶ 4.)  At the time he was hired, O'Donnell was qualified to teach only Social Studies. (*Id.* ¶ 17.)  He continued as a teacher at the Juvenile Justice Center for the 2008-09 school year, but he was transferred in October 2008 to Women In Need of Greater Strength (WINGS), a program for teens and young adult females.  He received a satisfactory rating for the school year and returned in the fall of 2009.  (*Id.* ¶ 6.)  When that program closed, he was transferred to the Monroe County Correctional Facility (MCCF) where he taught incarcerated juvenile offenders. (*Id.* ¶ 7.)  After receiving another transfer in mid-spring to the Colonial Academy to serve as a daily substitute, he received a satisfactory rating upon completion of the 2009-10 school year. (*Id.*)

At the start of the 2010-11 school year, O'Donnell was once again assigned to the MCCF.  (*Id.* ¶ 8.)  On November 2, 2010, Binczak, O'Donnell's immediate supervisor for 3-1/2 years, visited the MCCF to observe him.  (*Id.*)  Binczak entered O'Donnell's classroom unannounced.  After commenting on viewing a student's excellent report card, Binczak asked the student, "I see that you have excellent marks, Is [sic] Mr. O'Donnell challenging you in your lessons, or is he taking it easy on you?"  (*Id.* ¶ 22.)  When the students left for lunch, Binczak began questioning O'Donnell and asked to see his lesson plans and grade book for the first quarter.  (*Id.* ¶¶ 8, 23.)  O'Donnell did not provide them; he explained to Binczak that his lesson

plans were at home on his computer.  (*Id.* ¶¶ 8, 24.)  O'Donnell further explained that, because

the Defendant did not provide him with an Internet-connected computer or a printer, he was

forced to develop lesson plans on his home computer.  (*Id.*)  Binczak reported her observation to

the CIU's Human Resources Director Anthony Pidgeon.  (*Id.* ¶ 8.)  On November 5, 2010,

O'Donnell received a fax from Binczak informing him that he had two weeks to produce the

lesson plans and grade book for the first marking period.  (*Id.* ¶¶ 9, 25.)

On or about November 11, 2010, Binczak visited O'Donnell's classroom again.  She

presented him with a "Classroom Observation" document which contained various ratings of his

work performance allegedly observed during the November 2, 2010 visit.  (*Id.* ¶ 26.)  Binczak

told O'Donnell that she had been directed to make the November 2, 2010 visit into a formal

Observation.  (*Id.*)  In the Classroom Observation document, virtually all of the thirty

performance items were rated as "Unsatisfactory."  (*Id.* ¶ 27.)  Some of the items were not scored

or rated at all.  Comments offered by Binczak at the end of the document were derogatory.  (*Id.*)

On or about November 15, 2010, O'Donnell submitted a formal, written response to the

"Classroom Observation" to Binczak.  He stated that Binczak did not comply with CIU policy

that requires both Pre-Observation and Post-Observation conferences.  (*Id.* ¶ 28.)  O'Donnell

questioned the validity of the Observation document given that Binczak was in the classroom

setting for only three minutes before the students were dismissed for lunch.  (*Id.*)  In his written

response, O'Donnell pointed out additional errors and deficiencies with the Observation, many

of which violated CIU policy.  (*Id.* ¶ 29.)

On November 16, 2010, Binczak presented O'Donnell with a Staff Improvement Plan.

(*Id.* ¶ 30.)  The Plan focused on lesson plans, grading, and miscellaneous responsibilities.  (*Id.*)

After viewing the Staff Improvement Plan, O'Donnell told Binczak that he was not in agreement

with the Plan.  He contended that the Plan charged him with not performing duties that were the responsibility of other school personnel.  (*Id.*)  O'Donnell also contended that he did not have adequate training and certification for some of the responsibilities that the Plan noted he did not perform adequately.  (*Id.*)  Finally, he noted that he was being held unduly responsible for not completing certain duties which were no longer necessary due to changes in program funding streams.  O'Donnell told Binczak that the Improvement Plan "lacked merit and was punitive in nature and design."  (*Id.*)  The next day, he was presented with a Second Staff Improvement Plan by Binczak at a meeting of which he had no prior notice.  (*Id.* ¶ 32.)  Binczak's supervisor, Dr. Jan Cunningham, was present.  O'Donnell expressed confusion in stating that this Plan brought the total of the Improvement Plans under which he was now performing to three.  (*Id.*)  He explained that an Improvement Plan had been imposed by the CIU in 2008 and was not completed and that the Plans of November 16, 2010 and November 17, 2010 counted for an additional two Plans.  (*Id.*)  O'Donnell expressed his understanding that an employee can only be working under one Improvement Plan at a time.  (*Id.*)

O'Donnell expressed his confusion and concern about the existence of three Plans. Binczak admitted she made several errors in the November 16 Plan.  (*Id.* ¶ 33.)  O'Donnell informed Binczak that the November 16 Plan and the November 17 Plan did not list or establish any timelines for evaluation.  Also, neither of the Plans listed the resources necessary for him to successfully complete the requirements, two of which were a computer and a daily lesson plan template.  (*Id.*)  On November 17, 2010, O'Donnell presented Binczak with lesson plans and grades for the first quarter.  (*Id.* ¶ 34.)  Binczak accepted the submission so students could receive the grades, but she advised O'Donnell she would need "full-fledged" lesson plans going

forward.  She directed him to submit the lesson plans to her each week for the following week.
(*Id.* ¶ 10.)

On or about November 23, 2010, O'Donnell was directed by HR Director Pidgeon to
attend a *Loudermill*[1] hearing to be held on December 8, 2010 to discuss matters of concern
regarding his work performance.  (*Id.* ¶¶ 11, 38.)  On or about December 4, 2010, O'Donnell
informed Pidgeon of his various mental health conditions and the medication regimen that he
was following.  (*Id.* ¶ 21.)  On or about December 7, 2010, he requested to Pidgeon that Human
Resources provide him with a detailed, specific listing of all of the charges against him.  (*Id.* ¶
39.)  O'Donnell was denied such a list.  (*Id.*)  He also made other numerous requests to Pidgeon
regarding the *Loudermill* hearing, all of which were denied.  (*Id.*)  At the beginning of the
meeting, he asked Pidgeon for a written copy of the allegations/charges for which the *Loudermill*
hearing was being convened, but this request was denied.  (*Id.* ¶ 40.)  During the hearing,
O'Donnell presented rebuttals to various charges brought up against him.  (*Id.* ¶ 41.)  Binczak,
however, was not in attendance at the hearing, which precluded O'Donnell from asking her
questions.  (*Id.*)  The hearing ended without any decisions or conclusions.  (*Id.*)  At the hearing
O'Donnell advised Pidgeon that his lesson plans and examples of student work (referred to as
"artifacts") were at the facility.  He invited Pidgeon to visit the MCCF.  (*Id.*)

On December 9, 2010, Pidgeon visited O'Donnell at the facility. O'Donnell had a written
lesson plan for the day, but he did not produce any prior lesson plans.  (*Id.* ¶ 12.)  O'Donnell told
Pidgeon that the students' work was located in a locked cabinet that he could not access.
Pidgeon came into O'Donnell's classroom unannounced, stating that he was there "just to
observe."  (*Id.* ¶ 42.)  He immediately began asking questions and O'Donnell asked him not to

---

[1] *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (providing for a pre-termination hearing for public employees with a constitutionally protected interest in their jobs).

interrupt instructional time. (*Id.*) Pidgeon continued asking questions and began talking with some of the students. O'Donnell began feeling the onset of anxiety and a panic attack. (*Id.* ¶¶ 12, 42.) He informed Pidgeon of these conditions. (*Id.* ¶ 42.) Later that day, at approximately 9:50 a.m., he invoked his *Weingarten*[2] rights as Pidgeon persisted with questions and repeated requests for O'Donnell to leave his classroom to obtain records. (*Id.* ¶ 43.) At approximately 9:55 a.m., O'Donnell began packing his files and books and informed the house staff that he would be leaving the building immediately due to anxiety and the onset of a major panic attack. (*Id.* ¶ 44.) At that same time, he informed Pidgeon that he was leaving the building as well, and Pidgeon asked him again to get records. (*Id.* ¶ 45.) O'Donnell informed him that he had invoked his *Weingarten* rights and was having serious health issues. (*Id.*) Pidgeon smiled as he told O'Donnell, "You are making [my] job very easy." (*Id.*) He left the building at approximately 10:10 a.m. (*Id.*)

On December 10, 2010, O'Donnell received notification from Pidgeon and Human Resources that he was being suspended, without pay, pending further action. (*Id.* ¶¶ 13, 46.) The Defendant's reason for the suspension action was that O'Donnell allegedly failed to comply with the directives of supervisors and engaged in misconduct, which were allegedly discussed on December 8, 2010. (*Id.* ¶ 47.) As of December 13, 2010, O'Donnell did not receive a letter from Human Resources summarizing the findings of the *Loudermill* hearing on December 8, 2010. (*Id.* ¶ 48.)

On December 16, 2010, O'Donnell requested and received Family and Medical Leave for a medical condition. (*Id.* ¶¶ 14, 49.) The leave, originally approved for 6 weeks, was extended an additional 6 weeks to March 15, 2011. (*Id.* ¶ 14.) On April 15, 2011, Pidgeon issued to

---

[2] *See NLRB v. Weingarten, Inc.*, 420 U.S. 251, 262, 267 (1975) (holding that employees have right to union representation at an investigatory interview under § 7 of the National Labor Relations Act).

O'Donnell a Notice of Hearing and Statement of Charges alleging that he "did not complete lesson plans and grade the students as required . . . refused or failed to compose a daily schedule of the subjects to teach . . . [and] refused or failed to teach the students as required."  (*Id.* ¶ 15.) The CIU charged him with "persistent negligence in the performance of duties . . . willful neglect of duties . . . [and] persistent and willful violation of school laws."  (*Id.*)  The CIU Board of School Directors terminated O'Donnell effective April 28, 2011 for the charges cited in the Statement of Charges.  (*Id.* ¶ 16.)

O'Donnell alleges on information and belief that he did not "fail to comply" with any directives from Binczak or any other supervisors (*id.* ¶ 50); he never committed any form of "misconduct" while employed with the Defendant (*id.* ¶ 51); and he was discriminated against due to his disabilities, of which the Defendant was aware.  (*Id.* ¶ 52.)  O'Donnell also alleges on information and belief that: (1) employees without known disabilities were treated more favorably, and were not issued any Staff Improvement Plans for similar performance actions (*id.* ¶ 35); (2) the only teachers he knows of that have been placed on Staff Improvement Plans, were teachers with known disabilities and/or physical/mental impairments (*id.* ¶ 36); (3) the Defendant has a history of using Staff Improvement Plans as a punitive, disciplinary tool intended to harass and ultimately remove these individuals from employment (*id.*); and (4) the Defendant was using the Staff Improvement Plans to remove him from employment as well, since the Defendant was aware of O'Donnell's disabilities.  He contends that he was deprived of his property interest in his employment without due process of law because his *Loudermill* hearing was procedurally inadequate (*id.* ¶ 90), and, although he prosecuted a grievance under his collective bargaining agreement and he was allowed to take his case to arbitration, he was not paid his salary while the grievance was prosecuted.  (*Id.* ¶¶ 90-91.)

III.   **DISCUSSION**

     a.     **The ADA and PHRA Claims**

In order to plead a *prima facie* case of discrimination under the ADA, a plaintiff must allege:  "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. . . ."  42 U.S.C. § 12102(1).  "Major life activities" include but are not limited to:  caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  42 U.S.C. §  12102(2)(A).

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

The ADA Amendments Act of 2008 (ADAAA) require that courts inquire into whether an impairment substantially limits a major life activity "without regard to the ameliorative effects of mitigating measures."  42 U.S.C. § 12102(4)(E)(i).  Mitigating measures include medication, assistive technology, and reasonable accommodations.  *Id.* § 12101(4)(E)(i)(I).  Thus, under the ADAAA's expanded definitions of "disability" and "major life activities," treatable yet chronic conditions may qualify as a disability.  However, the ADAAA left untouched the plaintiff's

9

burden of proof in a disability case; he still has to prove he has a disability.  The plaintiff thus bears the burden of producing evidence about how his condition would affect him if left untreated.

CIU argues that O'Donnell has not pled a plausible *prima facie* case under the ADA, *i.e.*, that he is a disabled person within the meaning of the Act, because his allegations of merely being diagnosed with mental health disorders do not show the necessary factual specificity that he had an impairment that "affected one or more life activities."  (Def. Mem. at unnumbered page 6.)  O'Donnell responds that he has adequately pled facts to support a plausible ADA claim, arguing that he has alleged that the major life activities affected by his mental health disability include learning, working and cognitive function.   (Pl. Mem. at 4.)

Irrespective of Plaintiff's assertions in his Response, these allegations do not appear in the Amended Complaint, where he alleges only that he has been *diagnosed* with several mental health disorders and, since 1988, has received various forms of treatment for them.  (*See* Am. Compl. ¶¶ 18-19.)  He also alleges that he suffered an anxiety attack while at school on December 9, 2010, after being confronted by his supervisors regarding his failure to turn in his lesson plans and grades.  (*Id.* ¶¶ 42-44.)  However, he makes no plausible allegations identifying substantial limits on the major life activities affected by his mental health disorders, whether treated or untreated, that would satisfy the ADA's definition of a disability.  While he cites cases supporting his argument that cognitive functioning can be a major life activity, *see*, *e.g.*, *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 569 (3d Cir. 2002) (concentrating); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (thinking), it remains that the Amended Complaint is devoid of sufficient factual matter, taken as true, to draw the reasonable inference that he suffers

from substantial limitations in these areas, so that the Defendant may be held liable under the ADA for an allegedly discriminatory adverse employment action.

Alternatively, O'Donnell argues that he satisfies the pleading standards for an ADA claim because he has sufficiently pled that CIU "regarded" him as disabled.  (Pl. Mem. at 7.)  To adequately plead that an employer regarded an employee as having a qualifying disability, the plaintiff must allege (1) that the employer believed that a wholly unimpaired plaintiff had an impairment that substantially limited at least one major life activity, or (2) that the employer believed an employee's actual impairment to limit major life activities when it in fact did not. *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (*citing Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 514 (3d Cir. 2001); *see also Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521-22 (1999) ("A person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities.") (recognized as superseded on other grounds by the ADAAA in *Kemp v. Holder*, 610 F.3d 231, 235 (5th Cir. 2010); *Lloyd v. Housing Auth. Of the City of Montgomery, Al.*, 857 F. Supp. 2d 1252, 1263 (M.D. Al. 2012)).

Thus, even under the "regarded as disabled" rubric, a plaintiff is still required to plead the existence of a substantial limitation on a major life activity, either because the employer mistakenly believed he had a non-existent impairment that caused one, or because the employer believed an actual impairment caused one, when it in fact did not.  O'Donnell has not pled plausible facts to demonstrate either alternative.  His only allegations are that during the 2008-09 and the 2009-10 school years, he informed Binczak of his mental health "disabilities" and the

treatments that he was receiving[3] (Am. Compl. ¶ 20), and that on or about December 4, 2010, O'Donnell informed Pidgeon of his various mental health conditions and the medication regimen that he was following.  (*Id.* ¶ 21.)  This is insufficient.  "[T]he mere fact that an employer is *aware* of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action."  *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) (emphasis added); *see also Kiniropoulos v. Northampton Cnty. Child Welfare Serv.*, Civ. A. No. 11-6593, 2013 WL 140109, at *4 (E.D. Pa. Jan. 11, 2013).

Accordingly, this Court concludes that O'Donnell has failed to state a claim upon which relief may be granted for violation of the ADA.  Because his claim under the PHRA is to be interpreted as identical to the ADA claim, *see Slagle v. Cnty. of Clarion*, 435 F.3d 262, 265 n. 5 (3d Cir. 2006) (*citing Fasold v. Justice*, 409 F.3d 178, 184 n. 8 (3d Cir. 2005)), this analysis of the ADA claim applies with equal force to O'Donnell's PHRA claim.  *Kelly*, 94 F.3d at 105; *see also Taylor*, 184 F.3d at 306.  However, given Plaintiff's assertions of impairments in his Response, this Court will permit him to file another iteration of his Complaint to cure these defects.

### b.   The FMLA Claim

The FMLA guarantees an eligible employee twelve workweeks of leave during any twelve-month period due to the birth of a child, a family member's serious health condition, the employee's own serious health condition, and other exigencies involving a family member's service in the armed forces.  29 U.S.C. § 2612(a)(1).  Upon an employee's return from FMLA leave, the employer must restore the employee to the position he held when his leave

---

[3] This Court notes that the assertion that O'Donnell had "disabilities," a legal conclusion rather than a factual allegation, is not an averment that must be accepted as true to assess if the factual allegations make out a "plausible claim for relief."  *Iqbal*, 556 U.S. at 678.

12

commenced or an equivalent position with equivalent benefits and conditions of employment. *Id.* § 2614(a).  The FMLA also makes it unlawful "for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise,"  FMLA rights.  *Id.* § 2615(a)(1).  Additionally, employers may not discriminate or retaliate against an employee based on the exercise of FMLA rights.  *Id.* § 2615(a)(2); 29 C.F.R. § 825.220(c) (prohibiting employers from discriminating or retaliating against an employee for exercising or attempting to exercise FMLA rights).

In order to plead a *prima facie* case of retaliation for exercising one's rights under the FMLA, a plaintiff must plead: (1) that he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of his right.  *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508–09 (3d Cir. 2009).  CIU argues that O'Donnell has failed to sufficiently plead causation as a matter of law between his invoking his FMLA rights and the alleged adverse employment action — its giving him notice of the *Loudermill* hearing that initiated the employment termination process — since the Amended Complaint avers that O'Donnell did not invoke his rights until three weeks *after* the notice was sent.  O'Donnell responds that he did not "learn of the outcome" of the *Loudermill* hearing until after he had been approved for leave; he argues that a defendant cannot approve FMLA leave and then interfere with it by taking an adverse job action after the leave begins. (Resp. at 15.)

The facts alleged in the Amended Complaint fail to state facts to plausibly support the causation element of an FMLA retaliation claim.  O'Donnell himself avers that the due process proceeding that led to the adverse employment action began when he received notice from Pidgeon on November 23, 2010 to attend the *Loudermill* hearing to be held on December 8, 2010.  Two days after the hearing, on December 10, 2010, he was told by Pidgeon that he was

being suspended, without pay, pending dismissal.  O'Donnell did not request leave for his medical condition until December 16, 2010.  Thereafter, on April 15, 2011, Pidgeon issued the Notice of Hearing and Statement of Charges, based on the work performance deficiencies that occurred *before* O'Donnell's FMLA leave period began.  From the face of these allegations, O'Donnell has not presented a plausible inference that his eventual termination was due to his exercising his FMLA rights.  While the temporal proximity of a plaintiff's request for leave and his suffering an adverse employment action may be sufficient to withstand a defendant's motion to dismiss for want of causation if the timing is "unusually suggestive of retaliatory motive," *see, e.g.*, *Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (holding that temporal proximity alone will only suffice where the timing is "unusually suggestive of retaliatory motive") (internal quotation marks omitted); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that two months, for instance, is not unusually suggestive, while two days is), in such cases the request for leave preceded the adverse action, not *vice-versa*.  This Court fails to see how an employee's request for medical leave *after* the adverse employment action has already been initiated by the employer can satisfy the causation element of retaliation claim.  Accordingly, O'Donnell has failed to state facts upon which causation can plausibly be grounded.

      c.      **The Section 1983 Due Process Claim**

      In *Loudermill*, the United States Supreme Court held that a public employee with a property interest in his or her job and faced with termination is entitled to a "pretermination opportunity to respond, coupled with post-termination administrative procedures."  *Id.* 470 U.S. at 547-48.  In particular, a "tenured public employee is entitled to [pre-termination process consisting of] oral or written notice of the charges against him, an explanation of the employer's

evidence, and an opportunity to present his side of the story." *Id.* at 546.  The pre-termination hearing may be informal so long as it affords employees an opportunity to make any "plausible arguments . . . that might have prevented their discharge." *Id.* at 544.  In other words, the pre-termination hearing must be "meaningful." *Id.* at 547. The "*sina qua non* of a meaningful hearing is a sufficient explanation of the employer's evidence to permit a meaningful response." *Fraternal Order of Police v. Tucker*, 868 F.2d 74, 80 (3d Cir. 1989).

Pre-deprivation due process is satisfied if, prior to the deprivation, a public employee is given:  (1) written or oral notice of the charges; (2) an adequate explanation of the evidence; and (3) an adequate opportunity to present his side of the story. *McDaniels v. Flick*, 59 F.3d 446, 454 (3d Cir. 1995). "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Loudermill*, 470 U.S. at 546.  Notice is sufficient if it apprises the employee of the nature of the charges and general evidence against him and if it is timely under the particular circumstances of the case. *Gniotek v. Philadelphia*, 808 F.2d 241, 244 (3d Cir. 1986) (citing *Loudermill*, 470 U.S. at 506).  Advanced notice is not required, so long as the timing of the notice does not prevent the employee from presenting his side of the story. *Id.* at 244-45. "[T]he timing and content of notice . . . will depend on appropriate accommodation of the competing interests involved[,]" namely the employer's interest in quickly removing an unsatisfactory employee and the employee's interest in retaining employment. *Gross v. Lopez*, 419 U.S. 565, 579 (1975). "Pretermination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee 'the opportunity to determine what facts, in any, within his knowledge might be presented in mitigation of or in denial of the charges.'" *McDaniels*, 59 F.3d at 457 (quoting *Gniotek*, 808 F.2d at 244); *see also Tucker*, 868 F.2d at 80

(holding that although four discharged police officers were sufficiently informed of disciplinary action against them and given an opportunity to state their objections at arbitration, they were nevertheless deprived of a "meaningful" pre-termination hearing because "they were not told anything specific about . . . the allegations being investigated or the evidence regarding the allegation").

Defendant argues that the procedural due process claim must be dismissed because the allegations in O'Donnell's Amended Complaint concede that he received all the process that was due an employee in a pre-termination proceeding, that is itself followed by a full post-termination grievance/arbitration proceeding.  In his Response to the Motion, Plaintiff argues that he was denied a meaningful *Loudermill* hearing because the day before the hearing, and again at the hearing, he requested that HR Director Pidgeon provide him with a detailed and specific list of all charges against him, and "made other numerous requests," all of which were denied.[4]  (Resp. at 11-12, quoting Am. Compl. ¶¶ 39-40.)

---

[4] Although not specifically mentioned in the Response, the Amended Complaint makes an additional specific allegation that O'Donnell's due process rights were violated because Binczak was not present at the pre-termination hearing, which allegedly precluded Plaintiff from asking her questions.  (Am. Compl. ¶ 41.)  This Court finds that this allegation also fails to state a plausible claim for relief.  Where, like here, there is an opportunity for a full post-termination hearing, due process does not require that the employer provide the employee with "elaborate, trial-type rights" at the pre-termination hearing, such as the right to cross-examine witnesses or present witnesses in the employee's defense.  *See Loudermill*, 470 U.S. at 545-46 (pretermination hearing is not a full, trial-type evidentiary hearing to resolve the propriety of the discharge); *Schmidt v. Creedon*, 639 F.3d 587, 596-97 (3d Cir. 2011); *Head v. Chi. Sch. Reform Bd. of Tr.*, 225 F.3d 794, 804 n.9 (7th Cir. 2000).  The hearing can be "somewhat truncated," and need only be "an initial check against mistaken decisions - essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  *Schmidt* at 596-97 (quoting *Loudermill* 470 U.S. at 545).  It has been held that due process does not give public employees the right to confront or cross-examine witnesses at a pre-termination hearing.  *See Staples v. City of Milwaukee*, 142 F.3d 383, 387 (7th Cir. 1998).  Accordingly, the absence of Binczak from the pre-termination hearing did not violate Plaintiff's due process rights.

16

First, this Court finds that O'Donnell's allegation that the *Loudermill* hearing violated his due process rights because he was denied unspecified "other numerous requests," is too amorphous to create a plausible claim for relief.  On the specific allegation that he was denied a list of the charges against him, this Court finds that O'Donnell did have actual, if informal, notice of the charges to be discussed at the *Loudermill* hearing, sufficient to satisfy the requirements stated in *Gniotek*.[5]

The Amended Complaint alleges that on November 17, 2010, Binczak had confronted him about the problems with his lesson plans and grades and had directed him to submit them within the following week, which he failed to do.  (Am. Compl. ¶ 10.)  It also alleges that Pidgeon notified him on November 23, 2010 that the purpose of the December 8 hearing was "'to discuss matters of concern with your work performance.'"  (*Id.* ¶ 11.)  O'Donnell concedes that he understood that this hearing was to be a *Loudermill*  hearing.  (*Id.* ¶ 38.)  Finally, Plaintiff alleges that the "reason for the suspension action was that [he] allegedly failed to comply with the directives of supervisors and engaged in misconduct. . . ."  (*Id.* ¶ 47.)  Accordingly, it is clear that O'Donnell had informal timely notice sufficient to apprise him that the nature of the charge to be discussed at the pre-termination *Loudermill* hearing was his failure to submit lesson plans and grades.  For a pre-termination hearing that is to be followed by a more formal post-termination grievance/arbitration proceeding, this is sufficient to satisfy the requirements of due process.  Accordingly, the procedural due process claim is subject to dismissal.

_____

[5] Defendant has appended as Exhibit A to its Motion a copy of the written Notice allegedly sent to O'Donnell.  CIU argues, given the content of the Notice, that O'Donnell's due process claim based upon the lack of notice of the specific charges against him is disingenuous.  Defendant's argument based on Exhibit A is itself disingenuous.  The document, which is undated but, according to Plaintiff, was sent on April 15, 2011 (*see* Am. Compl. ¶ 15), charges misconduct not only related to the events of November 17 and 23, 2010, but also charges O'Donnell with misconduct occurring on December 9, 2010, one day after the *Loudermill* hearing.  Thus, it clearly was issued after the hearing and cannot serve as pre-hearing notice.

**IV.** **CONCLUSION**

For the reasons expressed herein, this Court grants Defendant's Motion to Dismiss the Amended Complaint.  Plaintiff's claims under the ADA and PHRA are dismissed without prejudice and his remaining claims are dismissed with prejudice.  An appropriate order follows.